*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

FELICIA BUCHANAN, Personal Representative of
the ESTATE OF ERNESTINE DAVIS,

        Plaintiff-Appellant,

v

ASCENSION PROVIDENCE HOSPITAL, doing
business as PROVIDENCE-PROVIDENCE PARK
HOSPITAL SOUTHFIELD CAMPUS, SUDAD
LOUIS, M.D., PLLC, INPATIENT
CONSULTANTS OF MICHIGAN, PC, MANHAL
TOBIA, M.D., PC, SUDAD L. LOUIS, M.D.,
KIMBERLY NICOLE PRYOR, D.O., and ZIYAD
T. ISKENDERIAN, M.D.,

        Defendants,
and

INDEPENDENT EMERGENCY PHYSICIANS,
PC, and SAIYEDA N. ABBAS, M.D.,

        Defendants-Appellees.

UNPUBLISHED
January 15, 2026
9:35 AM

No. 370653
Oakland Circuit Court
LC No. 2022-193541-NH

Before: GADOLA, C.J., and REDFORD and RICK, JJ.

PER CURIAM.

In this medical malpractice action, plaintiff-appellant, Felicia Buchanan as the personal representative of the estate of Ernestine Davis, appeals by leave granted[1] the trial court's order

---

[1] *Estate of Ernestine Davis v Ascension Providence Hosp*, unpublished order of the Court of Appeals, entered November 20, 2024 (Docket No. 370653).

-1-

granting summary disposition to defendants-appellees, Saiyeda N. Abbas, M.D., and her employer, Independent Emergency Physicians, PC ("IEP").[2] The trial court dismissed plaintiff's claims of negligence and vicarious liability against the respective Abbas defendants on the ground that she failed to establish a genuine issue of material fact whether Dr. Abbas's alleged negligence proximately caused the death of Ernestine Davis. Viewing the record evidence in a light favorable to plaintiff as the nonmoving party, we conclude there was a genuine issue of material fact regarding causation and the trial court erred by concluding otherwise. Accordingly, we reverse the trial court's order and remand for further proceedings consistent with this opinion.

## I. BASIC FACTS AND PROCEDURAL POSTURE

This appeal stems from the death of Davis, a 73-year-old woman, following strokes she suffered while a patient at Ascension Providence Hospital in Southfield, Michigan. Davis was last seen by her family members in a normal state at approximately 10:00 p.m. on April 9, 2017. Sometime in either the late evening of April 9 or early morning of April 10, Davis fell in her home. After a family member found her on the floor the next morning, she was transported via emergency medical services to the Ascension Providence Hospital's Emergency Room ("ER"). Davis arrived at the ER at 12:48 p.m. and was treated by emergency medicine physician Dr. Abbas.

In the ER, Dr. Abbas noted that Davis was alert, oriented, and not in any apparent distress. Davis presented with a facial droop, blood pressure of 180/95, and a heart rate of 87. A neurological examination revealed no other focal motor deficits other than the facial droop. Dr. Abbas performed a National Institute of Health ("NIH") Stroke Scale assessment and evaluated Davis at a score of 1.[3] Dr. Abbas ordered a CT without contrast of Davis's head and brain, which revealed no acute intracranial process. Dr. Abbas diagnosed Davis with a suspected stroke; noted that she was outside the time frame to take tPA, a medication used to dissolve blood clots that cause strokes;[4] and ordered aspirin. No other testing was performed while Davis was in the ER.

Dr. Abbas admitted Davis to the medical/surgical floor. Davis left the ER at 6:08 p.m. After Davis was admitted to the medical/surgical floor, she was under the care of attending physician Kimberly Pryor, internal medicine physician Ziyad Iskenderian, and consulting

---

[2] All defendants other than Dr. Abbas and IEP have settled the claims against them or were dismissed previously to this appeal. For clarity, we refer to defendants-appellees as the "Abbas defendants."

[3] The NIH Stroke Scale is a risk assessment used by healthcare providers to assess the severity of a stroke. A lower score on the scale corresponds to a lower severity stroke. National Institute of Neurological Disorders and Stroke, *NIH Stroke Scale* <https://www.ninds.nih.gov/health-information/stroke/assess-and-treat/nih-stroke-scale> (accessed December 3, 2025).

[4] National Institute of Neurological Disorders and Stroke, *Tissue Plasminogen Activator for Acute Ischemic Stroke* <https://www.ninds.nih.gov/about-ninds/what-we-do/impact/ninds-contributions-approved-therapies/tissue-plasminogen-activator-acute-ischemic-stroke-alteplase-activaser> (accessed December 3, 2025).

neurologist Sudad Louis.  Orders were entered to monitor Davis's blood pressure and heart rate and to monitor for signs of bleeding.

Davis's condition began to worsen after she left the ER.  Nursing staff checked Davis's neurological functioning at 6:38 p.m. on April 10, noting that she remained alert and had appropriate conversational speech at the time.  A couple of hours later at 8:00 p.m., nursing staff checked Davis's neurological functioning again and noted that she appeared confused and had expressive aphasia, a condition causing difficulty in producing speech.  By 10:50 p.m. that day, nursing staff noted the same findings of confusion and expressive aphasia, and further noted that Davis's speech had become slurred and she was experiencing deficits in her legs and arms.  The same conditions were noted early in the morning of April 11 at 5:37 a.m. and 6:00 a.m.  Sometime near 9:00 a.m., Dr. Pryor noted that Davis had developed global aphasia and her NIH Stroke Scale assessment elevated from a score of 1 the day before to 28.  Dr. Pryor order an MRI.

In the morning of April 11 before the MRI was performed, a nurse practitioner evaluated Davis for surgery.  He noted that Davis's condition had worsened overnight and he suspected that she had an expanding left middle cerebral artery stroke.  He concluded Davis was beyond the time frame for acute treatment, such as neurovascular rescue.

The results of the MRI were available April 11 at 8:03 p.m. and showed that Davis suffered a stroke, specifically an occlusion of the M1 segment of the left middle cerebral artery.  A CT angiogram[5] was performed the same day at 11:00 p.m., and demonstrated the same result.  On April 11 and 12, after reviewing the results of the MRI and CT angiogram, a neurovascular surgery team evaluated Davis for a thrombectomy and opted not to perform the surgery.

Davis remained hospitalized as her condition worsened.  On April 13, Davis became nonresponsive after her heart rate dropped.  A Rapid Response was called and Davis was stabilized.  Davis had suffered several strokes of worsening severity during her hospitalization. She remained hospitalized over the next month and subsequently died on May 15, 2017.

Plaintiff filed this medical malpractice action on April 8, 2022.  As relevant to this appeal, plaintiff alleged a claim of negligence against Dr. Abbas for (1) failing to order a timely neurology consultation, (2) failing to order an interventional radiology consultation, (3) failing to call a "code stroke," and (4) failing to order further testing and monitoring of Davis.  Plaintiff alleged a claim of vicarious liability against IEP for failing to hire and train its agents and failing to ensure that appropriate policies and procedures were adopted and followed.  In support of the complaint, plaintiff provided affidavits of merit from Bruce Janiak, M.D., a licensed physician in emergency

---

[5] A CT angiogram uses contrast dye to create an image of blood vessels and is generally used to see if arteries are narrowed or blocked.  Cleveland Clinic, *CT Angiogram* <https://my.clevelandclinic.org/health/diagnostics/ct-angiogram> (accessed December 3, 2025).

medicine; Hiren M. Shah, M.D., a licensed physician in internal medicine; and Chitra Venkatasubramanian, M.D., ("Venkat"),[6] a licensed physician in neurology.

Defendants deposed Dr. Janiak, plaintiff's standard-of-care expert for Dr. Abbas. Dr. Janiak testified that Dr. Abbas breached the standard of care when treating Davis in the ER in two ways—by failing to order a code stroke and by failing to order a CT angiogram. Dr. Janiak explained that calling a code stroke would notify a team consisting of a neurologist, nurses, and other personnel associated with a stroke team to intervene in the patient's care. According to Dr. Janiak, it made no difference that Davis was "neurologically normal" and presented with only a facial droop. A code stroke was necessary "because of all the other complications in terms of picking the best therapeutic approach." Additionally, Dr. Janiak explained that patients like Davis all needed a CT angiogram.

Defendants also deposed Dr. Venkat and Gregg Zoarski, M.D., a neurointerventional radiologist and neuroradiologist. Both doctors testified as plaintiff's causation experts. Generally, both experts opined that Davis had an occlusion in the left middle cerebral artery and, because it was not properly recognized, diagnosed, and treated, Davis suffered worsening strokes and died. As relevant to this appeal, both experts opined that had a CT angiogram been performed in the ER and had Dr. Abbas called a code stroke, Davis would have undergone a different course of treatment and her death would have been avoided.

The Abbas defendants moved for summary disposition under MCR 2.116(C)(10) for failure to establish a genuine issue of material fact regarding causation. The Abbas defendants argued that plaintiff's standard-of-care expert only found two breaches of the standard of care by Dr. Abbas: (1) the failure to order a CT angiogram and (2) the failure to order a code stroke. The Abbas defendants argued that, even if these two breaches occurred, plaintiff could not establish that the two breaches would have changed the outcome of Davis's death. According to the Abbas defendants, plaintiff's experts set forth a timeline for action or intervention that would have changed the outcome of her death only after Davis left Dr. Abbas's care in the ER.

In response, plaintiff conceded that her standard-of-care expert testified about only two breaches of the standard of care by Dr Abbas, i.e., the failure to order a CT angiogram and the failure to call a code stroke. However, plaintiff argued that her experts, Dr. Venkat and Dr. Gregg Zoarski, testified how the failure to obtain the CT angiogram or order a code stroke meant that Davis's stroke was not timely or appropriately diagnosed and caused the failure to timely intervene. According to plaintiff, Dr. Venkat testified that Davis initially presented with a minor stroke and subsequently suffered a major stroke at the hospital, leading to her death. Had Dr. Abbas called a code stroke and ordered a CT angiogram on April 10, the extent of her stroke would have been discovered and curable and Davis would have had a good prognosis.

The trial court issued an opinion and order without oral argument. The trial court found there was no genuine issue of material fact related to causation after characterizing Dr. Venkat's and Dr. Zoarski's testimony as failing to set forth a theory of "but for" causation. Accordingly,

---

[6] In the trial court, the parties referred to Dr. Venkatasubramanian as Dr. Venkat. We follow this convention on appeal.

the trial court dismissed plaintiff's negligence and vicarious liability claims against the respective Abbas defendants. The trial court also denied plaintiff's motion for reconsideration. This appeal followed.

## II. STANDARD OF REVIEW

This Court reviews de novo a trial court's decision on a summary disposition motion. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). A motion under MCR 2.116(C)(10) tests the factual sufficiency of a claim. *Id*. at 120. "When considering such a motion, a trial court must consider all evidence submitted by the parties in the light most favorable to the party opposing the motion." *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 160; 934 NW2d 665 (2019). A court properly grants summary disposition when the moving party establishes, except for the amount of damages, there is no genuine issue as to any material fact. *Barnard Mfg Co, Inc v Gates Performance Engineering, Inc*, 285 Mich App 362, 369; 775 NW2d 618 (2009). "A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ." *El-Khalil*, 504 Mich at 160 (quotation marks and citation omitted).

## III. ANALYSIS

Plaintiff argues the trial court erred by granting summary disposition to the Abbas defendants. Plaintiff contends that she demonstrated a genuine issue of material fact on the causation element of her medical malpractice claims. We agree.

In a medical malpractice action, the plaintiff must establish four elements: "(1) the appropriate standard of care governing the defendant's conduct at the time of the purported negligence, (2) that the defendant breached that standard of care, (3) that the plaintiff was injured, and (4) that the plaintiff's injuries were the proximate result of the defendant's breach of the applicable standard of care." *Craig v Oakwood Hosp*, 471 Mich 67, 86; 684 NW2d 296 (2004). The failure to establish any one of these four elements necessitates the failure of a plaintiff's medical malpractice action. *Benigni v Alsawah*, 343 Mich App 200, 213; 996 NW2d 821 (2022). In this case, the trial court concluded that plaintiff failed to establish a genuine issue of material fact regarding causation.

When asserting a medical malpractice claim, "the plaintiff has the burden of proving that he or she suffered an injury that more probably than not was proximately caused by the negligence of the defendant or defendants." MCL 600.2912a(2). "Proximate cause" is a term of art consisting of both cause in fact, i.e., "but for" causation, and legal causation. *Craig*, 471 Mich at 86-87. Cause in fact, which is the element of causation at issue in this appeal, "generally requires showing that 'but for' the defendant's actions, the plaintiff's injury would not have occurred." *Id*., quoting *Skinner v Square D Co*, 445 Mich 153, 163; 516 NW2d 475 (1994). "While a plaintiff need not prove that an act or omission was the sole catalyst for his injuries, he must introduce evidence permitting the jury to conclude that the act or omission was *a* cause." *Craig*, 471 Mich at 87 (emphasis omitted).

"Cause in fact may be established by circumstantial evidence, but such proof must be subject to reasonable inferences, not mere speculation." *Wiley v Henry Ford Cottage Hosp*, 257

Mich App 488, 496; 668 NW2d 402 (2003). To establish a defendant's conduct was a cause in fact of his or her injuries, the plaintiff must "set forth specific facts that would support a reasonable inference of a logical sequence of cause and effect." *Craig*, 471 Mich at 87 (quotation marks, citation, and alteration omitted) The evidence "need not negate all other possible causes," but the evidence must "exclude other reasonable hypotheses with a fair amount of certainty." *Id.* at 87-88 (quotation marks and citation omitted). Additionally, expert testimony is required to establish causation in a medical malpractice action. *Kalaj v Khan*, 295 Mich App 420, 429; 820 NW2d 223 (2012).

In this case, Dr. Abbas was alleged to have breached the standard of care in two ways when she treated Davis in the ER—by failing to order a CT angiogram and by failing to call a code stroke. In its opinion and order granting summary disposition in favor of the Abbas defendants, the trial court explained that plaintiff's experts failed to support the conclusion that "but for" Dr. Abbas not ordering a CT angiogram or calling a code stroke on April 10, 2017, Davis would not have passed away. The trial court found that Dr. Venkat did not specifically testify that either of the asserted breaches of the standard of care on April 10, 2017, caused Davis's death. According to the trial court, Dr. Venkat instead testified that "the event that she came in with, with a facial droop, in the majority of people it resolves and improves" and "[i]t does not impact their functionality in any way." Additionally, the trial court found Dr. Zoarski's testimony failed to present any conclusion regarding Davis's cause of death. Apparent from its analysis, the trial court failed to consider the entirety of the expert testimony from Dr. Venkat and Dr. Zoarski. See *El-Khalil*, 504 Mich at 160.

Plaintiff's claim of malpractice on the part of Dr. Abbas is predicated on the theory that her failure to order the CT angiogram and code stroke while Davis was in the ER delayed identification and lifesaving treatment of Davis's deteriorating condition. According to plaintiff, these omissions caused the failure for Davis's stroke to be timely or appropriately diagnosed and caused the failure to timely intervene. In support of this theory, Dr. Venkat testified that Davis had a minor stroke at home and had several progressively worse strokes while she was hospitalized, with increasingly severe strokes occurring on the morning of April 11 and on April 13.[7] Dr. Venkat explained that when Davis presented to the ER on April 10, her stroke was "because of the occlusion in the left middle cerebral artery" and "her brain had good collaterals, whereby she was able to supply all the key cortical areas through those collaterals." According to Dr. Venkat, a patient who presents to the ER with Davis's initial symptoms "resolves or improves" and "does not impact their functionality in any way." However, in this case "every time her blood pressure was dropped those collaterals didn't function properly causing lowered perfusion" and "because it was not treated on the 10th or the 11, or later, [Davis] went on to have a permanent stroke."

---

[7] Defendants argue that pursuant to MCL 600.2169(1)(a), Dr. Venkat's testimony cannot be relied on for a theory of causation regarding Dr. Abbas's conduct because Dr. Venkat and Dr. Abbas do not share the same specialty. This argument is without merit. MCL 600.2169(1) expressly applies to standard-of-care testimony. The statute does not prevent an expert from opining on subjects that do not involve the standard of care, such as causation. *Halloran v Bhan*, 470 Mich 572, 578 n 6; 683 NW2d 129 (2004).

-6-

Dr. Venkat testified that, if Davis had a CT angiogram or MR angiogram "when she presented on the 10th," "either one would have demonstrated that she had a segment of her left MCA that was occluded, but it also would have shown that she had distal flow and collaterals." Upon these findings, "she would have been placed in a highly monitored setting, such as an ICU or a step-down unit, with frequent neuro checks" and where it would have been "ensure[d] that she was properly hydrated, and ensure[d] that her blood pressure was not allowed to drop to the point where she deteriorated by having additional neurological symptoms." Further, she would have been "loaded with aspirin and Plavix." Dr. Venkat opined that, on April 10, Davis required the medical management she described, including dual antiplatelet agents, hydration, and avoidance of blood pressure drops which resulted in her worsening neurological symptoms, but she would not have required "intervention." Finally, Dr. Venkat opined that if Davis's stroke were properly treated, she would not have died.

Similar to Dr. Venkat, Dr. Zoarski testified that Davis's neurological deficits were minimal when she was admitted to the ER and her condition deteriorated after she was admitted to the medical/surgical floor. Likewise, Dr. Zoarski testified that had Dr. Abbas ordered a CT angiogram in place of the initial CT, the test would have shown a large vessel occlusion. Dr. Zoarski reiterated that had the CT angiogram been performed on April 10, Davis would have been admitted to a neurological critical care unit and undergone frequent neurological checks, such that her neurological deterioration would have been more promptly recognized and managed differently than her treatment on the medical/surgical floor. Dr. Zoarski did opine that Davis was not a candidate for a thrombectomy on April 10; however, if the CT angiogram were performed and she was subject to the frequent neurological checks, she would have been a candidate for mechanical intervention on the morning of the April 11. Further, Dr. Zoarski testified if the thrombectomy were performed the morning of April 11, Davis would have survived and had a significant chance of recovery of function.

Viewing this testimony in a light most favorable to plaintiff as the nonmoving party, plaintiff established a genuine issue of material fact regarding causation. In both the trial court and on appeal, the Abbas defendants focused on the fact that Davis's symptoms were minor when she presented to Dr. Abbas and she was not a candidate for mechanical intervention while she was in the ER. Both of these contentions are supported by the record evidence; however, plaintiff's theory of causation is premised on the assertion that the extent of Davis's stroke was discoverable during her time under Dr. Abbas's care and had Dr. Abbas performed the appropriate testing, she would have been admitted to a neurological critical care unit where she would have received appropriate monitoring and prompt treatment. Both Dr. Venkat and Dr. Zoarski testified that had the CT angiogram been performed in the ER, Davis would have been monitored more closely, and, when her condition started to deteriorate, she would have been promptly and appropriately treated, such that she would have survived with a chance of recovery of function. The evidence sets forth substantial specific facts to support a reasonable inference of a logical sequence of cause and effect. *Craig*, 471 Mich at 87.

Defendants further assert that Dr. Abbas's alleged omissions were not a cause of Davis's death because the facts of this case demonstrate that in the several days after Davis left the ER, the appropriate neurological experts evaluated her while she was hospitalized and determined she was not a candidate for mechanical intervention. Defendants contend that these facts demonstrate plaintiff would have died regardless of Dr. Abbas's alleged omissions because the acts Dr. Janiak

testified that should have occurred in this case did occur. The facts of this case demonstrate that Davis received several surgical consultations on April 11 and 12 for surgery while she was hospitalized, which resulted in the consultant declining surgery at those times. In the morning of April 11, a nurse practitioner evaluated Davis without the benefit of a CT angiogram and concluded she was not a candidate for surgery, noting that she was outside the time frame for treatment from her initial stroke. After a CT angiogram and MRI were performed in the evening of April 11, a neurovascular surgery team again evaluated Davis on April 11 and April 12 and opted not to perform the surgery.

Although these consultations resulted in the surgical team declining to perform mechanical intervention on April 11 and 12, expert testimony in this case directly indicates that a different result would have occurred had the CT angiogram and code stroke been timely ordered. Dr. Venkat testified that with the prompt referral to a stroke team and an earlier CT angiogram on April 10, Davis would have had a course of treatment that did not allow her neurological symptoms to deteriorate to the point where she needed mechanical intervention to have a good prognosis. Likewise, Dr. Zoarski testified that if the CT angiogram were performed on April 10 and Davis were placed in a neuro critical care unit, her providers would have known she had a large vessel occlusion and would have been able to closely watch her deteriorating condition, such that she would have become a candidate for mechanical intervention on the morning of April 11 and would have had a good prognosis. This testimony is in contrast to the nurse practitioner who evaluated Davis that morning and decided she was not a candidate without the benefit of the CT angiogram. Dr. Zoarski further testified that Davis was not outside the time frame for intervention at that point because the clock restarted for intervention when she had a new stroke event. This expert testimony supports that with the benefit of an earlier CT angiogram and close observation of Davis's deteriorating symptoms, she would have been a candidate for surgery and a different result would have occurred. This at least creates a question of fact whether Dr. Abbas's conduct placed Davis in the position for her condition to worsen without appropriate monitoring and treatment.

It is apparent the trial court failed to consider all of the testimony of Dr. Venkat and Dr. Zoarski. See *El-Khalil*, 504 Mich at 160. On this record, a genuine issue of material fact existed regarding causation. Viewed in a light most favorable to plaintiff as the nonmoving party, the evidence supported a conclusion that but for Dr. Abbas's failure to order a CT angiogram and failure to order a code stroke, Davis would have been monitored more closely and when her condition deteriorated, she would have undergone a thrombectomy or other appropriate treatment such that she would not have suffered the major stroke and died. See *Craig*, 471 Mich at 86-87. This evidence was not too attenuated to be speculative, but rather set forth substantial specific facts to support a reasonable inference of a logical sequence of cause and effect. *Id*. at 87. Therefore, the trial court erred by granting summary disposition in favor of the Abbas defendants.

Reversed and remanded for further proceedings. We do not retain jurisdiction.

/s/ Michael F. Gadola
/s/ James Robert Redford
/s/ Michelle M. Rick